## Case No. 3,719.

DE CAMP v. NEW JERSEY MUT. LIFE INS. CO.

[3 Ins. Law J. 89; 21 Pittsb. Leg. J. 162; 4 Bigelow, Ins. Cas. 287.][2]

Circuit Court, S. D. New York. Dec. 22, 1873.

LIFE INSURANCE—SPECIAL AGENT — DELIVERY OF POLICY—CREDIT FOR PREMIUMS—APPLICATION—TRUTH OF REPRESENTATIONS — DEATH FROM INTOXICATING LIQUORS — QUESTION FOR JURY — PROOFS OF LOSS—PHYSICIAN'S CERTIFICATE.

[1. A stranger who procures an application for insurance, and takes it to the insurance com-

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [21 Pittsb. Leg. J. 162, and 4 Bigelow, Ins. Cas. 287, contain only a partial report.]

pany, which approves the same, executes a policy, and delivers it to him, with instructions to deliver it to the insured only upon payment of the premium, thereby becomes its special agent to receive the premium and deliver the policy.]

[2. A delivery of the policy by the agent without exacting the premium, and upon the promise of the assured to pay in a few days, makes a binding contract from the date of delivery, subject only to the payment of the premium; and, if payment is in fact made within the time named, the insured is not bound to disclose to the insurer the fact of a change for the worse in the condition of health, which has taken place in the meantime. Nor is it material that the agent never accounts to the company for the premium so received.]

[3. Actual delivery of the policy into the possession of the assured is immaterial, if at the time it is tendered they examine it so as to become acquainted with its terms, and assent thereto, and subsequently pay the premium.]

[4. Whether the statements made in an application which becomes part of the policy be regarded as warranties or as material representations, they must be true at the time they are made; and if untrue, in a material respect, the policy is void.]

[5. Whether a death resulting from the use of liquors during a period of three weeks is caused by an "habitual" use of intoxicating liquors, within the meaning of a condition in the policy, is a question for the jury.]

[6. Where plaintiff, on the request of the insurer, but without being bound thereto by the terms of the policy, furnishes, as part of her proofs of loss, the certificate of a physician as to the cause of death, she is not concluded by the statements therein made, but may show the fact to be otherwise.]

Colton was agent for another insurance company. Becoming acquainted with De Camp, he solicited him to apply to the defendant for a policy on his life. The application was made June 1st, 1869, and the medical examiner of the defendant on the 3rd pronounced him a first-class risk. Colton endorsed the application as agent for the defendant. Defendant accepted the application and indorsed Colton's name as its agent on the policy June 5th, and delivered it to him, with instructions, however, to deliver it only on payment of premium. Colton, who was boarding in the family with De Camp, delivered the policy on the 5th. De Camp gave it to his wife and told Colton that he would pay the premium in a few days, to which Colton assented. On the 8th Colton wrote to the defendants that the policy had not been delivered, and that the premium had not been paid; but as De Camp promised to pay in a few days, he proposed to hold it and give him the opportunity. Defendant replied on the 10th, approving of the suggestion of Colton. On the 9th De Camp had taken hyoscyamus to quiet excitement arising from his domestic troubles and the use of liquor, and would have died but for medical aid. This condition of affairs was repeated on the 13th. On the 14th, Mrs. De Camp testified, he paid Colton the premium, and at some subsequent time, it does not exactly appear when, Colton took the policy at his own request from Mrs.

De Camp for safe keeping, and after her husband's death she recovered it from him by a replevin suit. Defendant put in evidence letters from Colton written both before and after the death of De Camp, to the effect that the premium had not been paid or the policy delivered. Defendant also claimed that De Camp was not temperate when the application was made, and that it was untrue in this respect. One condition of this policy was, that if the insured should die from the "habitual use of intoxicating liquors" the policy should be void. The evidence showed that De Camp had made use of liquor after the application was signed, so as to be intoxicated. The inquisition made by the coroner the plaintiff had submitted as part of the proofs of loss, and it was introduced in evidence under the plaintiff's exception. The inquisition found De Camp had died from the habitual use of intoxicating liquors. It also appeared that Mrs. De Camp had been examined before the coroner, and had given evidence strongly tending to show that her husband had been a drinking man for years, and that he had taken opiates as remedies for the disorders induced by drink. That, however, was explained by the evidence of the attending physician, who said that she was so overcome with grief and mental agony at the time as not to be in a fit state to be examined. The evidence of De Camp's past life up to his death was that he was temperate, but the post mortem examination showed evidences consistent with the theory of death from liquor, and the attending physician said that on two or three occasions when he was called in, and after the application was made, he was wildly intoxicated, but that this might have resulted from a slight use of liquor, owing to the severe mental excitement under which De Camp was laboring. Defendant, among other things, claimed that as this agency was special, confined to this one policy, plaintiff dealt with him at her peril, and was bound to examine his authority; that the policy in no event could take effect until the actual payment of the premium; that until the payment, the policy was a mere proposition to insure, and that the payment was an implied reiteration by the plaintiff of the statements in the application, and that inasmuch as De Camp had partaken of liquor to excess, and had impaired his health by drugs, the policy was avoided.

Plaintiff requests to charge—as to the delivery of the policy and payment of premium:

(1) That there is no conflict of evidence but that Colton delivered this policy on the 5th or 6th of June, 1869, without exacting the prepayment of the premium, which act was sufficient in law to justify the belief that a loan of credit for the premium was extended, and the condition of the policy in this respect waived; and if Mrs. De Camp accepted the policy with that understanding, the contract became valid and operative immediately, and the company was bound. (2) That

if Mrs. De Camp innocently relied upon the apparent authority to be reasonably inferred from Colton's possession of the policy, and for that reason was induced to postpone immediate payment of the premium, the company became bound on delivery. (3) Same of De Camp as plaintiff's agent. (4) That if the company's direction to Colton, not to deliver the policy until premium was paid, was a mere secret or private instruction, and inasmuch as there is no proof that she ever knew it, it can have no effect whatever on her rights. (5) That the maxim of natural justice here applies with full force, that "he who without intentional fraud has enabled a person to do an act which must be injurious to himself or another innocent party, shall himself suffer the injury rather ·than the innocent party who has placed confidence in him." (6) That there is no question but that Colton's actual authority, with respect to this policy, continued down to and including the actual payment of the premium on the 14th of June, 1869, so that he was then an authorized agent of the company to receive it. (7) That even if there was no waiver of prepayment of premium, the payment on the 14th of June, 1869, was compliance with the condition of the policy in that respect, and it related back to the date of the acceptance by the company of the application for insurance. (8) That if the plaintiff and her husband made full, fair and honest disclosures of all the facts material to the subject of inquiry in the application, they were guilty of no fraud and concealment. (9) That in doing this (8) they were only obliged to disclose so much as was material to their own minds. (10) That although the application was the basis for the policy, its statements were not warranties, and an innocent mistake upon any question of disease or health, made by Mr. or Mrs. De Camp, would not affect the validity of the policy. (11) That even if there had been a waiver and the policy had not taken effect until the payment of the premium, neither the plaintiff nor her husband were obliged to disclose any voluntary statements. (12) That upon that hypothesis (11), if the company desired information of later facts than those shown by the application, it was its duty to have inquired about them, and that then the plaintiff or her husband would have been guilty of fraud or concealment in that respect. (13) That since there was no conflict of evidence about the delivery of the policy or payment of the premium, the only question for the jury is as to the cause of death.

That in respect to the cause of death:

(1) The insurance company is not entitled to a verdict unless De Camp's death was caused "by the habitual use of intoxicating liquor." ʲ(2) It is not enough to excuse the company that intoxicating liquors caused his death. (3) It is not enough to excuse the company that his death was caused by the excessive use of intoxicating liquor. (4) The term "intoxicating liquor" is to be construed in its ordinary and popular ·sense. (5) That inasmuch as there is no conflict against Dr. Johnson's statement, that the anodyne and opiates used by him are not included in the popular term "intoxicating liquors," the jury are bound to believe his statement in that respect. (6) That the burden of proof rests upon the company, and it is bound to show ·by a fair preponderance of evidence that death resulted from the habitual use of intoxicating liquor before they will be entitled to a verdict. (7) That it is not enough for defendant to show that death ought not to have resulted from the habitual use of intoxicating liquors; or, (8) that such liquor or its habitual use contributed to cause death. (9) They must be satisfied that his death actually resulted from such habitual use as· the primary and controlling cause, and that death would have resulted at that time independently of the use of the narcotics, and of this, too, the jury must be satisfied by a fair preponderance of evidence. (10) That if De Camp only took intoxicating liquor in moderate quantities, medicinally, to quiet nervous excitement arising from other causes, and not from habit, and that death resulted from such use, the defendant cannot recover on this branch of the case. (11) That in determining the cause of death, the jury are bound to give just consideration to the evidence of De Camp's appearance shortly before his death, as they may deem it deducible from the testimony of Mr. Jencks, Mr. and Mrs. Johnson, Mrs. De Camp, Brockway and other witnesses, who speak upon that subject, as well as the medical witnesses, and to harmonize all the credible testimony on that subject if that can be done.

Defendant requests to charge:

(1) That prior to the transactions in question A. R. Colton never acted as the agent of the defendant in any way whatever, and since the transactions in question A. R. Colton has never acted as agent for the defendant in any way whatever. (2) That A. R. Colton was the agent of the plaintiff in making the application for the policy in suit. (3) That in this transaction no relation of agency existed between the defendant and A. R. Colton; except that Colton received the policy from the defendant, to be held by him in escrow, and to be delivered to the plaintiff upon the payment of the premium, but not otherwise. 25 Conn. 542; 1 Bigelow, Ins. Cas. 51. (4) That the delivery of the policy by A. R. Colton to the plaintiff or her husband, even if made, would not complete the contract of insurance or make it binding unless or until the premium was actually paid. (5) That·if the jury believe that the premium on the policy was never actually paid, prior to the death of De Camp, then the contract of insurance never became complete, and there can be no recovery on the policy. (6) That even if the jury believe that the premium was paid to Colton on or about the

14th of June, 1869, as claimed by the plaintiff, nevertheless, if at that time John H. De Camp was so seriously ill that defendants would not have delivered the policy had they known that *fact, and that fact was fraudulently concealed from the defendants by Mr. and Mrs. De Camp and Colton, acting in collusion with each other, there can be no recovery on the policy. (7) Even if the jury believe that the payment of premium claimed was actually made, yet if they believe that it was made at a time when De Camp was so seriously ill that the defendants, if they had been aware of the facts, would not have delivered the policy, and such a payment was a part of a collusive and fraudulent scheme which was carried out and perfected after the death of De Camp, by collusive proceedings arranged between the plaintiffs and Colton, under which she got possession of the policy, the plaintiff cannot recover. (8) That if any of the statements made by the plaintiff in the application for said policy were untrue, the plaintiff cannot recover. (9) That if the statement contained in such application, that at the date thereof, to wit, the 4th day of June, 1869, the said John H. De Camp was in good health was untrue, the plaintiff cannot recover. (10) That if the statement contained in such application, that at the date thereof, to wit, the 4th day of June, 1869, the said De Camp was sober and temperate, was untrue, the plaintiff cannot recover. (11) That in determining the question of the truth or untruth of this statement, the sworn statement of plaintiff made at the coroner's inquest, that John H. De Camp has drunk to excess for the last two months, is evidence that such was the fact, and that the statement in that regard in the application was untrue. (12) That if in making such application, facts were withheld in regard to the health and habits of life of the said De Camp, with which the defendant ought to have been made acquainted to make such insurance, the plaintiff cannot recover. (13) That if in making the application there was withheld from the defendant the fact that John H. De Camp was in the habit of making excessive use of either alcoholic or narcotic stimulants, the plaintiff cannot recover. (14) That if the jury believe that the habitual use of intoxicating liquors was a contributing cause to the death of John H. De Camp, the plaintiff cannot recover. (15) That if such use of intoxicating liquors did not become habitual until after the date of the application, nevertheless if it was a contributing cause to the death of De Camp, the plaintiff cannot recover. (16) That upon the question as to the cause of the death of De Camp, the plaintiff is concluded by the statement contained in her proofs of loss, including the verdict of the coroner's jury included in such proofs, and it appearing from such proofs that such use of intoxicating liquors was a contributing cause of the death of De Camp, the jury are directed to render a verdict in favor of the defendant. (17) That as it does not appear that at the time such proofs were served, the plaintiff was under any misapprehension as to the facts, she is concluded by the proofs and cannot recover. (18) That the facts stated in such proofs, inasmuch as they were not shown to have been made through mistake or to have been induced by fraud, are conclusive against the plaintiff, and that she cannot recover. Campbell v. Insurance Co., 10 Allen, 213. (19) That even if the plaintiff is not absolutely concluded by the statements contained in her proofs of loss, the said statements, especially when taken in connection with other statements of a similar nature made by the plaintiff before the coroner's jury, are evidence that the cause of the death of De Camp was as set forth in such proofs, and in the verdict of the coroner's jury, and are entitled to such weight and consideration as the jury should give them. (20) That in determining the cause of De Camp's death, the jury should give weight to the verdict of the coroner's jury as to the cause of such death, especially as such verdict constituted part of the proofs of loss served by the plaintiff on defendant.

Additional requests to charge were made in substance as follows:

That unless the statements and representations made in the application were fair and true, on the 14th day of June, 1869, or if any material fact which the defendant ought to have known at that time was suppressed in regard to the health of De Camp, the policy was null and void; that the application for all intents and purposes must be deemed to have been dated on the 14th day of June, 1869, when the premium, according to the plaintiff, was paid, and if any statements in the application were untrue at that time, the defendants are entitled to a verdict; that if any fraud was practiced on the company in the suppression of important information at the time when the premium was paid, the plaintiff cannot recover; that the representations in the application took effect on the 14th day of June, 1869, and are material representations.

John L. Hill and A. S. Diassy, for plaintiff.
Sandford, Robinson & Woodruff, for defendant.

SHIPMAN, District Judge. Gentlemen of the jury: This is an action to recover the sum of $10,000, and interest, being the amount named in a policy of insurance executed by the defendant upon the life of John H. De Camp, and payable to his wife, the plaintiff. It is evident from the testimony that the application for the policy dated June 4th, 1869, was made by the defendant and her husband at the suggestion of A. R. Colton, who, although he may have professed to be the agent of the company, was not then in any way in their employ; that he carried the application to the company, which was approved, and the policy produced upon this trial was exe-

cuted by them on the day of its date, June 5th, 1869; that the policy on said day was handed to Colton by the company, with instructions to deliver it to the parties named therein only in event of the payment of the premium to him; that he was authorized to receive the premium, and thereupon deliver the policy; that no instructions or information were communicated directly to the De Camps by the company; on the 24th day of June the insured died; on the 26th day of June, 1869, after the death of De Camp, the company by letter to Colton revoked the authority conferred at the time of the execution of the policy, Colton having informed them that the policy was not delivered; that the company never received from Colton any portion of the premium. These, gentlemen, are conceded facts, or else so proved that there is no serious or honest controversy in regard to them. It is testified by Mrs. De Camp that on the 5th or 6th of June, Colton delivered the policy to her husband, who accepted its terms and delivered it to her and promised to pay the premium in a few days, and that on June 14th he did pay the premium, amounting to $240, to Colton, who received it as in full payment. The company produce certain letters from Colton, which state that he has not delivered the policy. These letters, Colton being accessible as a witness, are not evidence to prove that the policy was not delivered or that the premium was not paid to him, but are explanatory simply of the letters of the company in revoking the agency.

There is no direct evidence on the subject of the payment of the premium and the receipt of the policy, except that given by Mrs. De Camp. The defendant offers testimony that after the death of Mr. De Camp, the policy being then in the possession of Colton, the policy was obtained from him by the plaintiff by an action of replevin, and offers testimony to prove that by collusion that policy was redelivered to Mrs. De Camp, who thus obtained it through a species of fraud. The plaintiff explains this evidence by her testimony that Colton received the policy from her before the death of her husband for the purpose of being deposited in a safe in New York, where she had other papers, for safe keeping, and that she sued him subsequent to the death of her husband to recover its repossession. The principles of law applicable to the facts in this part of the case are as follows: First, that Colton, prior to the execution of the policy, was not an agent of the defendants, although he may have professed so to act. Second, that upon the execution and delivery of the policy to him, he became the special agent of the company to receive the premium and to deliver the policy upon such receipt. Third, that assuming that the representations in the application are true, if you find that the De Camps were made acquainted on June 5th or 6th with the terms of the policy which had been executed by the defendants, and accepted those terms, and

paid $240 on the 14th of June to Colton, who received the money as in full payment of the premium, that thereupon it became a perfected and binding policy, notwithstanding Colton never paid the money or any part thereof to the defendant. It is true, as a general rule, that if, after the representations were actually made, a material change in the health of the insured occurs before the contract is consummated, it is the duty of the parties to inform the company of such facts; but, fourth, if you find that the policy was executed by the defendant and handed to Colton to be delivered to the applicants upon the receipt by him of the premium, and that they became acquainted with its contents on the 5th or 6th, and assented thereto, and promised to pay the premium in a few days, that the contract then became consummated, subject only to the payment of the premium, and that no duty was incumbent upon them thereon, except to pay the preimum, and upon its payment within the time named, to Colton, the policy became a completed contract, whereby the defendant insured the life of De Camp from June 5th, 1869, and that it was not obligatory upon the plaintiff to inform the defendant of any change in the health of her husband, if such there was, which took place after the 5th of June and prior to the 14th. You will then perceive, gentlemen, that in my view of the case, the fact of the delivery of the policy to Mr. De Camp on the 5th of June is immaterial, except that I regard it as important for the plaintiff to show that she actually acquiesced in the terms of the contract prior to any supposed change in the health of her husband, and that there was an assent on the part of both plaintiff and defendant to the terms of the policy; that the applicants then agreed to pay the premium, and did not leave the question of an acceptance of the policy an open one so as to speculate upon the probabilities of health. If the terms of contract were definitely agreed to on the 5th or 6th, naught remains but the payment of the premium, which was paid as promised, and before the death of the insured. I regard it as of no particular moment who had the custody of the policy between the 5th and the 14th. If I did regard it as material, I should charge you upon that point. The delivery of a policy is often a material point when credit for the payment is given or pre-payment is waived, and when payment of the premium is deferred until after the loss occurs. But when the terms of the policy are assented to by both parties, that is, when the company executes the policy and tenders it to the insured as the contract of the company, and the insured examines the policy and assents to its terms, agrees to it, and says, I am satisfied with that contract, I assent to it, and subsequently, before the loss or before a revocation, pays the premium, then it is immaterial for the purposes of the case who has the custody of the policy for the time being before its payment, because

it being a contract completed, if the company has it, it can be obtained from it by due process of law, or if it is destroyed, secondary proofs of its contents can be exhibited upon the trial. So that thus far, it is necessary that the premium be paid at some time either before or after the loss. If this premium was paid on the 14th, and prior to that time, upon the 5th or 6th, the contract was assented to on the part of the applicants, it then became a policy from June 5th. If it was not paid on the 14th, why it is agreed that it never was paid, for it confessedly has never been paid at any other time since that date. But if the payment and receipt of the policy was part of a collusive and fraudulent scheme, carried out and perfected after the death of De Camp by collusive proceedings, arranged between the plaintiff and Colton, under which she got possession of the policy, then the plaintiff cannot recover.

Now, to return to the testimony. The testimony upon these points comes from Mrs. De Camp. Colton is not a witness. You have heard the testimony in regard to the obtaining possession of the policy from Colton after the death of De Camp, or the recovery of the policy, as the plaintiff would put it. One side put it that it was an obtaining possession for the first time. The other side says that it was obtaining a recovery of the policy. It therefore having been lawfully in the possession of Mrs. De Camp, I shall not spend much time—any time in recapitulating the testimony. It is sufficient for me to say that if Mrs. De Camp is to be believed, if you rely upon her testimony—and you saw and heard her—then she had a right to the possession of the policy from and after the 14th of June. If you find the question thus far submitted to you in favor of the plaintiff, you will proceed to consider the other questions in the case, upon which the plaintiff rightfully says that the defendants take the burden of proof. Mr. De Camp died on the 24th of June, and proofs of loss were thereafter furnished to the company. By the terms of the policy, the representations made in the application by the applicants in regard to the health, history and habits of life of Mr. De Camp, became a part of the policy, and upon the faith of these representations the policy was issued, and if untrue in any material fact, the policy was avoided. Such statements are sometimes considered in law as warranties, and are sometimes called material representations, which must be true. The only representation upon which evidence has been offered by the defendant is the statement in regard to the temperance, and perhaps the general health of the insured; but the statement in regard to the sobriety and temperance is the principal one upon which evidence was offered. Whether the statement in regard to which a question is here raised is a warranty or a material representation, the rule of law applicable to its truth is the same;

and that is, that at the time of the application, Mr. De Camp must have been, and be found by you to be, a sober and temperate man in his habits in reference to intoxicating liquors, or the policy is voided, because the company had required and had a right to obtain correct information upon a point which they properly conceived to be material to the risk. The question did not inquire whether De Camp totally abstained from the use of liquor, but it did inquire whether he was a sober man; that is, whether he so far abstained, that is, whether he was such an abstinent that he was as a habit free from the excitement which the use of intoxicating liquor causes, and whether he was a temperate man—that is, was he habitually so far free from the use of liquor as to be a temperate man? If the defendant has satisfied you, on the evidence produced, that these questions in regard to the habits of De Camp, when he made the application, were not rightfully answered by him and his wife in the affirmative, the representations which De Camp made were untrue, and if untrue in this material respect, the company did not have a fair and honest statement of the risk which they were called upon to insure, and not having had such a statement the policy is avoided. Now, to come to the evidence upon this point of representation, that is, upon the habits of Mr. De Camp as to sobriety and temperance, prior to the 5th of June. The evidence on the part of the defendant—who, as I have said, takes the burden of proof—is Mrs. De Camp's statement before the coroner's jury, the evidence of the two Romers, and the fact, and the inferences which they would draw from this fact, to wit, that assuming that he died on the 24th of June from the effect of intoxicating liquor and stimulants, it is not credible that the use of liquor for so short a time as from the 5th to the 24th of June could have produced such serious results. Now, the evidence on the other side is that of various witnesses, and of the picture which has been produced before you and which was taken after the application, and which, as the plaintiff claims, shows that at that time, even after the application, and after he began, as the defendants say, to use liquor, shows that he was in apparent good health and free from outward and visible marks of intoxicating drink. The evidence on the other side consists of various witnesses who were produced by them. In the first place, Judge Roberts, Mills, Cochran, and the clerk of the board of supervisors, the various ladies who were produced upon the trial, and the other gentlemen living in and about Rye, whose names I cannot at this moment recall, but which you will recollect upon reflection, together perhaps with the last witness, the young man who had known him during boyhood and who had continued his acquaintance from that time down to the time of his death. These witnesses testify, as the plaintiff says,

that De Camp's habits during the time that he lived at Rye were uniformly those of a temperate and sober man. You will examine the evidence and ascertain whether the defendants have made out this point by a preponderance of proof.

The next condition of the policy is that if the insured shall die from the habitual use of intoxicating liquors, the policy is avoided. In this condition they stipulate that the cause of the death shall not be the habitual use of liquor voluntarily taken by the insured. I am asked to charge that these conditions are to be construed strictly against the company. In cases where the construction of language is the matter of any doubt, and where the meaning is ambiguous, that rule has been laid down by the courts, and is a correct one. In cases where the meaning is plain and the words are simple, the rule, while it exists, is not so important; but each word and adjective is material and is to be considered. The policy is substantially "that, if the insured shall die by the habitual use of intoxicating liquors;" the adjective "habitual" is material. It was inserted deliberately by the defendants in their contract, and has its meaning. I do not suppose that if a uniformly temperate man should be overcome with liquor, and die in consequence of a single debauch, he could be said to die in consequence of the habitual use of liquor. But it is not for me to say how long the use of liquor must be considered to make it habitual. You are to judge of this fact as of any other fact in the case. The law very frequently requires juries to find what is a reasonable time; there are numerous instances where juries are called upon to examine questions of that sort. And so you are to determine in case this man did die by use of intoxicating liquor, whether it had become habitual or whether it was a temporary thing, and you are also, permit me to say, permitted to find, if you choose, that the use of liquor between the 5th and 24th, or if you choose to find that the use of liquor for three weeks is an habitual use, you are permitted to do so. It is a thing entirely within your power. The testimony of the defendants is, that the death was caused by the excessive use of alcoholic liquors and opiates, and that statement is contained in the physician's certificate of death, and is exactly or substantially contained in the verdict of the coroner's jury. Now, in regard to the manner of his death, if De Camp used liquors habitually and excessively, and used opiates also, for the purpose of allaying the excitement of the liquor, and they combined to cause and did cause his death, and the liquor, directly, materially and effectually contributed to his death, then the policy was avoided. If you find that he used an undue quantity of liquor habitually, and in the wild and excited state which liquor created resorted to overdoses of opiates to produce quiet, and so, from the combined effect of these stimulants and narcotics, died—and observe this; if you find that the stimulants, that is liquors, directly, materially and effectively contributed to his death, then the policy is not binding upon the company.

Before considering the testimony I will refer to a point made by the defendant in regard to the proofs of loss. The defendant claims that the physician stated in his proofs of loss that the cause of his death was what I have stated, that is, that he died from the exhaustion produced by the overuse of alcoholic liquors and opiates; that is substantially it; that this was in violation of one of the conditions of the company, and the applicant is bound by the statement of the physician's certificate. I am aware that it has been held in a fire policy that where the applicant makes himself a sworn statement in his proofs of loss, required to be given by the terms of the policy, he is bound by that statement. All that the claimant is called upon in the policy to give, is to give due notice and proofs of the death or loss. The form is not stated. It is not incumbent upon her by the terms of the policy to give a physician's certificate, although it is proper for the company to ask it, and proper for her to comply with it; but if she does give it, is she concluded by the statement of the attending physician? I think not. It is not her statement. She furnishes it simply to comply with the request of the company. If she was concluded she might be injured, where there was no fraud, on the part of the physician, but where the physician was simply mistaken, and she might be therefore entirely remediless when she had a good case. It is evidence which you should consider and look at carefully. You are to give it weight. It was given at the time with knowledge of the circumstances; it was given under the solemnity of an oath; it was given when the physician was aware of the importance which would be attributed to it by the company, and in a pecuniary matter of no ordinary importance; and, on the other hand, it was not given under the criticism of a cross-examination. This point of the manner in which De Camp came to his death is the great and only leading fact in which a conflict of testimony arises in the case. On the one hand there is the statement of Dr. Johnson, Mrs. De Camp's evidence before the coroner's jury, the verdict of the jury, the testimony before you of three or four physicians—how many I don't recollect—and the fact that he did die in this sudden manner, and that as the defendant would claim he could not have died in this sudden and untimely manner unless there had been more liquor used by him than is disclosed by the other side. On the other hand, the plaintiff says that the physicians, including Dr. Johnson, do not verify the physician's certificate; that Mrs. De Camp's testimony is of no weight before the coroner on account of her excitement and the state of mind in which she was thrown by the sudden death of her

husband, and the fact that she was summoned before the coroner's jury under the circumstances of the case; that Mrs. De Camp now testifies with reliance and self-possession, and differs from her former testimony; that the experts are of the opinion that the symptoms of the post mortem do not point to alcoholism as the cause, or as one of the causes of death. They further show that his death was caused by a high state of mental excitement in consequence of domestic complication, aggravated by the use of liquor, in not large quantities, and mainly by exhaustion produced by very severe and over doses of narcotics taken to allay that excitement.

Now, gentlemen, I do not consider it my duty to analyze—to go through the testimony upon the one side and the other, and take up the witnesses and analyze them. I think that you are to look carefully at the physician's certificate and the verdict of the coroner's jury, and the testimony offered upon that subject; you are to look carefully and weigh the testimony offered on the other side; each item of it; all of it. You have heard all the testimony. It is not for me to decide upon this question of fact, and it is not for me to indicate on this question of fact. It is for you to decide, without any sort of prejudice in favor of or against either of these parties, but simply upon the evidence presented before you. If you find for the plaintiff, you will find the sum of $10,000 and interest from the expiration of ninety days after the rendition of the proofs of loss, and that date I have forgotten.

Mr. Hill: The 26th of October, 1869,—that is, the expiration of the ninety days.

THE COURT: If you find for the plaintiff you will find the sum of $10,000 and interest from the 26th of October, 1869.

Is there any point which I have omitted to charge, desired by either of you?

Mr. Hill: I will only call your honor's attention to a single fact, that the certificate of Dr. Johnson was given upon the same basis of facts upon which he gave his opinion at the coroner's inquest, which statement of facts has been materially changed by the evidence here produced.

THE COURT: Well, that is evidence, and they have got to weigh that evidence; I cannot do it; they must do it.

Mr. Hill: I will ask your honor to charge them, that if Mrs. De Camp innocently relied upon the apparent authority to be reasonably inferred from Colton's possession of the policy, and for that reason was induced to postpone the immediate payment of the premium, the company became bound upon the delivery of the policy to her in the first instance.

THE COURT: However that might be as an abstract question of law, I do not think it is material in this case, because, if her testimony is to be believed, she did pay the premium, and that ended that business.

Mr. Hill: I am in doubt whether I ought to have called your honor's attention to a single word, your charge has been so full, but in a little different manner from the propositions which I have made—that there is no conflict in the evidence, but that Colton delivered this policy on the 5th or 6th of June, 1869, without exacting the pre-payment of the premium, which act was sufficient of itself in law to justify the belief that the term of credit for the premium was extended, and the condition of the policy in this respect waived, and by Mrs. De Camp accepting the policy with that understanding, the contract became valid and operative immediately upon the company.

THE COURT: That is one of the same propositions. I think I have charged the jury fully upon that point.

Mr. Hill: There is only one thing more substantially (I suppose that any question of exception may arise after the jury have retired, so that I do not care to prolong the discussion now),—that the maxim of natural justice here applies with full force; that he who without intention of fraud has enabled a person to do an act which is injurious either to himself or to another innocent party, shall himself suffer the injury rather than the innocent party who has placed confidence in him should suffer.

THE COURT: That is one of the same class of propositions which, as I have already said, however true they might be as abstract propositions, are not material in this case.

Mr. Hill: There is only one word more. I will ask your honor to charge that the statements of this application, if honestly made by Mr. De Camp, are not warranties.

THE COURT: I can only charge that they are representations, and they must be true. If a party makes representations which are material, they must be true; they cannot avoid it by saying that they did not know what they were talking about.

Mr. Robinson, after some preliminary remarks: I now ask you to call the attention of the jury to the fact that Mrs. De Camp served such a statement (the certificate of the physician and the verdict of the coroner's jury) sometime after the death of the party, in which statement it appeared that a contributing cause of the death of De Camp was the use of intoxicating liquors; and that they shall take the circumstances into consideration in determining the cause of his death. I merely wish that your honor would call attention to that as well as to the certificate of the physician.

THE COURT: I intended to say that the proofs of loss contain both the physician's certificate and the verdict of the coroner's jury, which was intended, I suppose, to be an accurate transcript of the verdict.

Verdict for the plaintiff for the whole amount claimed.